**CONSOLIDATED RAIL CORPORATION,**
Plaintiff,

v.

**PRIMARY INDUSTRIES**
**CORPORATION,**
Defendant.

**CONSOLIDATED RAIL CORPORATION,**
Plaintiff,

v.

**PRIMARY COAL, INC.,** Defendant.

Nos. 92 Civ. 4927 (WCC),
92 Civ. 6313 (WCC).

United States District Court,
S.D. New York.

Nov. 10, 1994.

Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, for plaintiff Consolidated Rail Corp.; Paul D. Keenan, Philadelphia, PA, Barry N. Gutterman, Kroll & Tract, New York City, of counsel.

Smith Campbell & Paduano, New York City, for defendants Primary Industries Corp. and Primary Coal, Inc.; Anthony Paduano, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge:

Plaintiff moves for summary judgment on its claim that defendants owe certain freight charges due under a series of coal shipment contracts and on defendant Primary Coal's counterclaim for damages associated with that shipment. Primary Coal crossmoves for summary judgment on its counterclaim for damages. This court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). For the reasons stated below, plaintiff's motion is granted in part, and denied in part, while defendant Primary Coal's crossmotion is denied.

### I.

The following facts are undisputed by the parties. Consolidated Rail Corporation (Conrail), a Pennsylvania corporation with its principal place of business in Pennsylvania, is an interstate railroad carrier. Defendant Primary Coal, a New York corporation, had on numerous occasions from 1978 to 1991 entered into oral and written agreements with Conrail to ship coal from mines located principally in western Pennsylvania to Atlantic Ocean ports. Specifically at issue here, in February 1991, Primary Coal negotiated a series of four contracts with Conrail to ship

coal via rail from various mines to eastern seaboard ports. The contracts outlined the parties' liabilities and set the rates for transportation to, among others, Greenwich Coal Pier 124 in Philadelphia and Consolidation Coal Sales (Consol) Terminal in Baltimore. Pursuant to the contracts, Conrail was to ship coal to the specified terminals where it would be loaded onto vessels designated by Primary Coal for delivery to customers around the world. In addition, in March of 1991, Primary Coal provided Conrail with a shipping schedule outlining the rates and timings of deliveries pursuant to those contracts. All the contracts were made expressly subject to the loss and damage provisions of the Uniform Straight Bill of Lading,[1] 49 C.F.R. § 1005,[2] and 49 U.S.C. § 11707.[3]

In July of 1991, Conrail announced that it would close Pier 124 in Philadelphia. It informed Primary Coal of its decision and that all subsequent coal shipments to Pier 124 pursuant to its contracts would be diverted to the Consol Terminal in Baltimore. However, the diversion of shipments from Philadelphia and delays at the Baltimore terminal, possibly brought about by the diversion and a breakdown of Consol's loading system in August, prevented prompt delivery of coal to waiting vessels at Philadelphia and Baltimore. As a consequence, the vessel owners asserted demurrage claims against Primary Coal, who in response, claimed non-liability under force majeure provisions. While these delays were occurring, between September 5, 1991 and October 1, 1991, Primary Coal sent a series of correspondence to Conrail inquiring as to the delay, notifying them of its intent to hold Conrail liable for any damage associated with the delay, and asking Conrail to provide reasons for the delay to substanti-

1. The ICC-approved Uniform Straight Bill of Lading, § 2(b) requires that:

As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier ... within nine months after delivery of the property ..., and suits shall be instituted against any carrier only within two years and one day from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim.... Where claims are not filed or suits are not instituted thereon in accordance with the foregoing provision, no carrier hereunder shall be liable, and such claims will not be paid.

2. 49 C.F.R. § 1005 outlines the claim filing requirements as follows:

\* \* \* \* \* \*

§ 1005.2 Filing of Claims

(a) *Compliance with regulations.* A claim for loss or damage to baggage or for loss, damage, injury, or delay to cargo, shall not be voluntarily paid by a carrier unless filed, as provided in paragraph (b) of this section, with the receiving or delivering carrier, or carrier issuing the bill of lading, receipt, ticket, or baggage check, or carrier on whose line the alleged loss, damage, injury, or delay occurred, within the specified time limits applicable thereto and as otherwise may be required by law, the terms of the bill of lading or other contract of carriage, and all tariff provisions applicable thereto.

(b) *Minimum filing requirements.* A written or electronic communication (when agreed to by the carrier and shipper or receiver involved) from a claimant, filed with a proper carrier within the time limits specified in the bill of lading or contract of carriage or transportation and: (1) Containing facts sufficient to identify the baggage or shipment (or shipments) of property, (2) asserting liability for alleged loss, damage, injury, or delay, and (3) making claim for the payment of a specified or determinable amount of money, shall be considered as sufficient compliance with the provisions for filing claims embraced in the bill of lading or other contract of carriage....

(d) *Claims filed for uncertain amount.* Whenever a claim is presented against a proper carrier for an uncertain amount, such as "$100 more or less," the carrier against whom such claim is filed shall determine the condition of the baggage or shipment involved at the time of delivery by it, if it was delivered, and shall ascertain as nearly as possible the extent, if any, of the loss or damage for which it may be responsible. It shall not, however, voluntarily pay a claim under such circumstances unless and until a formal claim in writing for a specified or determinable amount of money shall have been filed in accordance with the provisions of paragraph (b) of this section.

3. 49 U.S.C. § 11707, often referred to as the Carmack Amendment, defines the liability of a carrier to a shipper for damages arising from shipment as follows:

(a)(1) A common carrier ... that delivers the property and is providing transportation or service subject to the jurisdiction of the Commission ... [is] liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property....

\* \* \* \* \* \*

(e) A carrier or freight forwarder may not provide by rule, contract, or otherwise, a period of less than 9 months for filing a claim against it....

ate Primary Coal's claims of force majeure against the vessel owners. Conrail responded with a series of form denials of liability for the vessel owners' demurrage claims.[4] Also in October of 1991, Conrail revoked Primary Coal's line of credit, requiring immediate payment for subsequent coal shipments.

In March 1992, Conrail commenced this action against Primary Industries, also a New York corporation, in the United States District Court for the Eastern District of Pennsylvania for $1,000,000 of Primary Coal's unpaid shipping charges associated with the four contracts. This suit was based on a letter issued in March 1978 by Primary Industries guaranteeing Primary Coal's payment of up to $1,000,000 of shipping charges to Conrail in exchange for extending credit to Primary Coal. Subsequently, in May of the same year, Conrail sued Primary Coal in the same court seeking the full $5,136,082.87 that it alleged was due. These suits were transferred to this court and consolidated for discovery purposes.

Primary Coal does not dispute that the shipping charges remain unpaid, but in September 1992, it filed a counterclaim arguing that any payment should be set off by damages associated with Conrail's rerouting and delays at the Consol Terminal. Primary Coal asserts that it paid out substantial sums of money to settle claims with vessel owners. As a result of these payments, and in conjunction with Conrail's revoking its credit, Primary Coal alleges that it was forced to shut down operations in December 1991. Therefore, it seeks damages in excess of $1,000,000 for breach of contract, tortious interference with contract, and tortious interference with economic advantage.

Conrail moves for summary judgment on its claim for freight charges against both Primary Coal and Primary Industries and on Primary Coal's counterclaims for damages. Primary Coal and Primary Industries oppose that motion and Primary Coal moves for partial summary judgment as to liability on its counterclaims.

## II.

As a preliminary matter, defendants argue that summary judgment is not appropriate in this case under Federal Rule of Civil Procedure 56(f). That rule provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Specifically, Primary Coal alleges it is entitled to discovery in five additional areas to develop its counterclaim sufficiently: a) Conrail's closing of Pier 124 and its effect on Conrail's customers; b) Conrail's knowledge of Primary Coal's contractual exposure due to this closing; c) the rerouting of Primary Coal's shipments during the latter half of 1991; d) documents showing the status of Primary Coal's shipments during the same period; and e) Conrail's knowledge of the claims for losses asserted by Primary Coal and other of its customers in the same position. On a prior motion to compel, however, Magistrate Judge Francis stayed discovery on these issues pending disposition of this summary judgment motion. *Consolidated Rail Corp. v. Primary Industries, Corp.*, 92 Civ 4927 (WCC), 1993 WL 364471 at *2 (S.D.N.Y. Sept. 10, 1993) (Memorandum and

---

4. A typical example of such a letter follows:

Date: 10/10/91
To: Mr. Lawrence Perlstein, Pres.
From: R.B. Schurr
Subject: Rail Car Delay
Dear Mr. Perlstein:
Please be advised there was a delay of 7 days at your mines receiving rail cars and delays in the normal movement of these cars which prevented the timely loading of the M/V Donau.
The delay was caused by breakdowns to the rail car dumper at the Consol Terminal resulting in a rail car shortage on Conrail. These events resulted in delays in the transportation of your coal and was entirely beyond your control. Conrail is not aware of the contractual arrangements you may have for use of any affected vessels and disclaims responsibility for any vessel demurrage under those agreements.
Sincerely,
Ralph Schurr
Conrail

Order of Magistrate Judge Francis). This Court agrees with Judge Francis that these issues "are clearly not pertinent to Conrail's pending summary judgment motion." Therefore, we deny defendants' request for further discovery at this time.

Defendant Primary Coal seems to misunderstand the purpose of Rule 56(f). It is designed to allow a party opposing summary judgment reasonable access to potentially favorable information. *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). To invoke the Rule's protection, however, the discovery sought must be material to the opposition of the summary judgment motion. *Sage Realty Corp. v. Insurance Co. of No. America*, 34 F.3d 124, 128 (2d Cir.1994). Moreover, as the Second Circuit has indicated, Rule 56(f) requires the opponent of a motion for summary judgment who seeks discovery to file an affidavit explaining: (1) the information sought and how it is to be obtained; (2) how a genuine issue of material fact will be raised by that information; (3) what efforts the affiant has made to obtain the information; and (4) why those efforts were unsuccessful. *Id.* The defendants' memorandum in opposition to Conrail's summary judgment motion and accompanying exhibits make no mention of how a genuine issue of material fact will be raised by any of this information, nor does the Court perceive its relevance.

Conrail's summary judgment motion argues that Primary Coal's counterclaims are barred by the claim filing time limits of the Uniform Straight Bill of Lading and/or are preempted by federal law. Although the information sought by Primary Coal may possibly be relevant to its damages due to Conrail's shipping delays, and therefore relevant to Primary Coal's crossmotion for summary judgment, this information has no relevance to either the applicability of the limitations

period or preemption.[5] Indeed, Primary Coal makes no argument that it is relevant other than to state generally, "[i]t would contravene the purpose of Rule 56(f) if the Court were to enter summary judgment on Conrail's claims before Primary Coal has the opportunity to discover facts that prevent recovery on those claims." *Defendants' Mem. in Opp.* at 38. None of the "facts" Primary Coal seeks to discover are relevant to "preventing recovery" on Conrail's motion for summary judgment.

Moreover, requiring additional discovery of marginally relevant material prior to this summary judgment disposition would waste the parties' as well as the Court's resources. If the Court finds that the defendant's counterclaims are barred by the Uniform Straight Bill of Lading and/or preempted by federal law, then further discovery concerning damages is unnecessary. Because additional discovery on issues irrelevant to plaintiff's motion is not warranted by Rule 56(f), and such discovery would only further impede the judicial process, the Court denies Primary Coal's request for further discovery concerning these motions for summary judgment. Having thus ruled, we will first consider Conrail's motion and Primary Coal's crossmotion for summary judgment on Primary Coal's counterclaims.

### III.

Primary Coal's counterclaims assert that it is entitled to damages from Conrail for breaching the shipment contracts, tortiously interfering with Primary Coal's contracts with vessel owners and customers, and tortiously interfering with Primary Coal's prospective economic advantage. On its motion, in response Conrail alleges 1) that Primary Coal failed properly to notify it of any claim as required by the Uniform Straight Bill of

---

5. The only area remotely relevant to defending against plaintiff's motion is the last: Conrail's knowledge of the claims for losses asserted by Primary Coal and other of its customers in the same position. As is more fully discussed below, although notice is certainly relevant to evaluating the limitations provisions under the Uniform Straight Bill of Lading, and hence to plaintiff's motion, a carrier's actual or constructive knowledge of damages associated with shipment is not.

*R.T.A. Corp. v. Consolidated Rail Corp.*, 594 F.Supp. 205, 209–10 (S.D.N.Y.1984) (citing *Pathway Bellows, Inc. v. Blanchette*, 630 F.2d 900 (2d Cir.1980), *cert. denied*, 450 U.S. 915, 101 S.Ct. 1357, 67 L.Ed.2d 340 (1981)). Instead, the notice that Primary Coal provided in writing to Conrail is controlling. Since this information is already in Primary Coal's possession, discovery surrounding the issue is unnecessary.

Lading and is therefore barred by the nine-month limitations period contained therein from asserting any claim for damages, and 2) that Primary Coal's common law claims are preempted by federal law. Since a favorable ruling on Conrail's motion against Primary Coal's counterclaims would render Primary Coal's crossmotion moot, we will first consider that motion.

## A.

Turning first to Conrail's preemption defense, preemption of state common law claims by federal law is a question of law for the court to decide and is properly disposed of on a motion for summary judgment. *Pennsylvania Medical Society v. Marconis,* 942 F.2d 842, 845 (3d Cir.1991); *cf. Turner v. Perales,* 869 F.2d 140, 141 (2d Cir.1989). In the present case, neither party disputes that the contracts at issue are governed by the Carmack Amendment and associated regulations. Therefore, the Court must decide whether the Carmack Amendment preempts Primary Coal's common law contract and tort counterclaims.

The Carmack Amendment was originally enacted in 1906 as part of the Hepburn Act, ch. 3591, 34 Stat. 595, and addresses the liability of common carriers for goods lost or damaged during a shipment over which the Interstate Commerce Commission has jurisdiction. Codified initially as 49 U.S.C. § 20(11) and now as 49 U.S.C. § 11707, it specifically allows shippers to recover for the actual loss or injury to their property caused by any of the carriers involved in the shipment.[6]

Shortly after the Amendment's enactment, the Supreme Court interpreted the Carmack Amendment broadly as occupying the entire interstate shipment field of commerce. *Adams Express Co. v. Croninger,* 226 U.S. 491, 506–08, 33 S.Ct. 148, 152–53, 57 L.Ed. 314 (1913). As the Court stated:

> [The Carmack Amendment] embraces the subject of the liability of the carrier under a bill of lading which he must issue, and limits his power to exempt himself by rule, regulation, or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it.

*Id.* at 505–06, 33 S.Ct. at 152. Similarly, every circuit that has considered the issue has relied on the reasoning of *Adams Express* to conclude that the Carmack Amendment preempts a shipper's state common law claims of breach of contract and negligence. *See Intech, Inc. v. Consolidated Freightways, Inc.,* 836 F.2d 672, 677 (1st Cir.1987) (Carmack Amendment is exclusive avenue for recovering damages for failure to unload shipment (breach of contract)); *Shao v. Link Cargo (Taiwan) Ltd.,* 986 F.2d 700, 705–07 (4th Cir.1993) (state negligence and breach of contract claims preempted); *Air Products & Chemicals, Inc. v. Illinois Central Gulf R. Co.,* 721 F.2d 483, 487 (5th Cir.1983), *cert. denied,* 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984) ("Congress intended by the Carmack Amendment to provide a uniform national remedy against carriers for breach of the contract of carriage, including a liability for default in any common-law duty as a common carrier"); *W.D. Lawson & Co. v. Penn Central Co.,* 456 F.2d 419, 421–24 (6th Cir.1972) (common law claim for damages preempted by Carmack Amendment); *Hughes v. United Van Lines, Inc.,* 829 F.2d 1407, 1415 (7th Cir.1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988) (Carmack Amendment preempted state law claims of negligence, breach of insurance contract, breach of contract of carriage, conversion, intentional misrepresentation, negligent misrepresentation, and negligent infliction of emotional distress); *Hopper Furs, Inc. v. Emery Air Freight Corp.,* 749 F.2d 1261, 1264 (8th Cir.1984) ("All actions against a common carrier, whether designated as tort or contract actions, are governed by the federal statute...."); *Hughes Aircraft Co. v. North American Van Lines, Inc.,* 970 F.2d 609, 613 (9th Cir.1992) (Carmack Amendment preempts state law negligence action); *Underwriters at Lloyds of London v. North American Van Lines, Inc.,* 890 F.2d 1112, 1121 (10th Cir.1989) (en banc) (same);

---

6. *See supra* note 3 for relevant text.

*cf. Cleveland v. Beltman North American Co.,* 30 F.3d 373, 379 (2d Cir.1994) (Carmack Amendment preempts federal common law claim for punitive damages).

■ Although none of these cases specifically addressed preemption of state law claims of interference with contract or interference with prospective economic advantage, we find their reasoning equally applicable to these causes of action. The primary purpose of the Carmack Amendment was to codify a uniform system of carrier liability that would provide certainty to both the shipper and the carrier. *See Adams,* 226 U.S. at 506, 33 S.Ct. at 152. Allowing state common law to supplement that system would undermine the certainty that the legislation was intended to provide. The Second Circuit's reasoning in its recent opinion in *Cleveland v. Beltman North American Co., Inc.,* 30 F.3d 373 (2d Cir.1994), although dealing with preemption of federal common law theories of recovery, also seems equally applicable to state law preemption. In that case the court held that resort to a punitive damage claim for a breach of the implied covenant of good faith and fair dealing would "thwart one of the primary purposes of the Carmack Amendment: that is, to provide some uniformity in the disposition of claims brought under a bill of lading...." *Id.* at 379. All three of Primary Coal's counterclaims, whether based on contract or tort, seek damages flowing from shipment agreements with Conrail. The Carmack Amendment governs the parties' rights and liabilities under this situation. Therefore, we hold that Primary Coal's common law claims for breach of contract, tortious interference with contract, and tortious interference with prospective economic advantage are preempted.

■ Primary Coal does not disagree, and even points to district court cases within this Circuit supporting a finding of preemption.

*See The Dress Barn, Inc. v. The LTA Group, Inc.,* 822 F.Supp. 88 (D.Conn.1993) (Carmack Amendment was shipper's exclusive remedy against carrier who lost goods); *Philips Consumer Electronics Co. v. Arrow Carrier Corp.,* 785 F.Supp. 436 (S.D.N.Y.1992) (Carmack Amendment governed liability for loss of goods transported in interstate commerce); *see also North American Phillips Corp. v. Emery Air Freight Corp.,* 579 F.2d 229, 234 (2d Cir.1978) (Carmack Amendment occupies field to exclusion of state law). Instead, Primary Coal argues that it is entitled to compensation for all its losses, whether under the common law or federal statute.[7]

While this Court finds Primary Coal's common law claims are preempted by federal law, since both parties agree on the applicability of the Carmack Amendment to this action, and given the liberal pleading requirements of the Federal Rules of Civil Procedure, *see* Fed.R.Civ.P. 8(f), we will construe Primary Coal's counterclaim for breach of contract as an action under the Carmack Amendment for damages. Therefore, the Court will look solely to 49 U.S.C. § 11707 and applicable regulations in determining the liability of Conrail to Primary Coal on its counterclaim.

**B.**

Given that the Carmack Amendment and its provisions provide the sole avenue for recovery by Primary Coal, the parties agree that under the shipment contracts, for a claim against Conrail to be valid, it must have been filed within nine months of the delivery. *See* Uniform Straight Bill of Lading § 2(b); 49 U.S.C. § 11707 (1988). Conrail claims that from the time of the rerouting and delay causing the alleged damages, August through October 1991, until Primary Coal filed its counterclaim in September

---

7. In essence, Primary Coal's counterclaims seek consequential damages—everything from the settlements it was allegedly forced to pay to vessel owners to the eventual demise of its business—due to the delay and rerouting of the shipments. Primary Coal is correct in asserting that these damages are recoverable under the Carmack Amendment. *See Starmakers Publishing Corp. v. Acme Fast Freight, Inc.,* 646 F.Supp. 780, 782 (S.D.N.Y.1986); *Hadley v. Baxendale,* 9 Ex. 341,

156 Eng.Rep. 145 (1854). On the other hand, although neither party has raised the issue, the contracts apparently attempted to prohibit recovery of these damages altogether. *See, e.g., Plaintiff's Exhibit 3,* ¶ 4. Because the Court finds Primary Coal's counterclaims under state common law are barred by preemption and under the Carmack Amendment are barred for failure to give proper notice, we have no occasion to reach this issue.

1992, it received no notice of a claim that complied with the contractually mandated requirements of 49 C.F.R. § 1005.2, and that Primary Coal's claims are therefore barred under the bill of lading notice provisions to which Primary Coal agreed. Primary Coal counters that 1) Conrail's initial suit filed in March 1992 tolled the limitations period; 2) a series of five letters sent to Conrail from September through October 1991 constituted claims for damages; and 3) even if these letters were deficient, Conrail's conduct in denying liability estops it from asserting any deficiencies.

Although both parties strongly urge their respective positions, neither party disputes the extent or content of communications between Primary Coal and Conrail during the relevant time period. The only contested issues are whether Conrail's action for the shipping charges "tolled" the nine-month limitations period, and if not, whether communications between Primary Coal and Conrail satisfied the mandates of 49 C.F.R. § 1005, which governs the content of claims.

■■■ Summary judgment is proper when no material issues of fact remain to be decided by the factfinder. The court will grant it "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). The movant bears the burden of establishing the absence of any disputed material fact, and all ambiguities and inferences to be drawn from the underlying facts should be construed in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Only disputes over facts that might affect the outcome of the suit under the governing law will proper-

ly preclude the entry of summary judgment. *Id.* at 248, 106 S.Ct. at 2510. Because there are no underlying factual disputes, and because what constitutes a valid claim under the Carmack Amendment is a question of law, summary judgment is the proper avenue to resolve these issues.[8] *See R.T.A. Corp. v. Consolidated Rail Corp.*, 594 F.Supp. 205, 208 (S.D.N.Y.1984); *Davis Acoustical Corp. v. Carolina Freight,* 775 F.Supp. 530 (N.D.N.Y.1991).

### 1. Tolling the nine-month period

■■■ Primary Coal's first argument in support of its counterclaim is that Conrail's filing suit to recover freight charges in March 1991 tolled the nine-month limitations period for asserting a claim for damages against Conrail. In support, Primary Coal lists a string of authorities indicating that federal statutes of limitations are tolled upon the filing of a suit, in the absence of express statutory language to the contrary. Primary Coal's reliance on these citations is inapposite, however, since none of them involves the precise situation at issue here: tolling a limitations period for bringing a *counterclaim* under the Carmack Amendment upon the filing of an initial suit for freight charges.

Primary Coal does cite two cases that address counterclaims to freight charges, however. Similar to the present case, *Shipping Corp. of India, Ltd. v. Pan American Seafood, Inc.,* 583 F.Supp. 1555 (S.D.N.Y.1984), involved an initial suit for freight charges filed within the statutory period and a counterclaim for damages added only after the time limit on claiming damages had expired. In that case, brought under the Carriage of Goods by Sea Act, 67 U.S.C. § 1301 et seq., Judge Lasker held that, "[s]ince recoupment is in the nature of a defense, it is never barred by the statute of limitations so long as the main action itself is timely." *Id.* at 1557.

---

8. Defendants urge that because there are issues of material fact with regard to notice, the Court cannot issue summary judgment. What constitutes notice is a question of law, however. *See Davis Acoustical,* 775 F.Supp. at 535. Only underlying factual disputes regarding what Primary Coal actually communicated to Conrail, and vice versa, would prevent entry of summary judgment. *Id.* There are none here.

Defendants' argument that there are issues of intent that prevent entry of summary judgment is equally misplaced. Evaluating whether proper notice was given involves only an examination of what written and electronic communications transpired between the parties. *See* 49 C.F.R. § 1005.2. The ICC regulations governing notice speak nothing of a party's intentions.

In *Seaboard Coast Line R. Co. v. Long Island R.R. Co.*, 447 F.Supp. 108, 113 (E.D.N.Y.1978), *aff'd*, 595 F.2d 96 (2d Cir. 1979), also involving a counterclaim, the court found the limitations period of § 16(3) of the Interstate Commerce Act (ICA) governing claims for overpayment of freight charges inapplicable and instead applied state law, which specifically tolled the limitations period of a counterclaim as of the date an action is commenced.

Conrail counters by arguing that neither of these cases involved the Carmack Amendment, which by its nature makes claims for shipping charges and claims for damages separate causes of action. *In re Penn Cent. Transportation Co.*, 477 F.2d 841 (3d Cir.), *cert. denied*, 414 U.S. 923, 94 S.Ct. 219, 38 L.Ed.2d 157 (1973); *Southern Pacific Co. v. Miller Abattoir Co.*, 454 F.2d 357 (3d Cir. 1972). Although both plaintiff's and defendant's claims arose out of the same set of shipments, Conrail argues that because a claim for damages under the Carmack Amendment is not a defense to an action for shipping charges, and hence is not a claim for recoupment, the strict time requirements of the ICC-approved Uniform Straight Bill of Lading are not tolled upon instituting a suit for shipping costs.

Neither the plaintiff nor the defendant cite any cases involving this precise issue, nor has the court discovered any.[9] *Pan American Seafood* involved a counterclaim for damages brought under the Carriage of Goods by Sea Act which contains a one-year statute of limitations on suits for damages. Nothing in that case suggests that its holding is applicable to actions under the Carmack Amendment or to the present bill of lading notice provisions. Similarly, in *Seaboard Coast Line*, a case also not implicating the Carmack Amendment, the court applied state law rather than the liability provisions of the ICA in determining the tolling effects of filing suit. Possibly most important, however, because both *Pan American Seafood* and *Seaboard Coast Line* involved statutory time

limits on bringing suit, not contractual claim filing requirements, their application to the present situation is questionable.

■ On the other hand, Conrail's reliance on the rationale of *Penn Central* and *Southern Pacific* is equally misplaced. One purpose of the Carmack Amendment is to prevent transportation companies from undermining ICC-regulated tariffs by setting off damages as a way of discounting shipping rates to favored customers. *Chicago & N.W. Ry. Co. v. Lindell*, 281 U.S. 14, 16, 50 S.Ct. 200, 201, 74 L.Ed. 670 (1930). Relying on this policy, the Third Circuit held in *Penn Central*, 477 F.2d at 845, that under the Interstate Commerce Act, a counterclaim for damages is not a defense to a carrier's claim for freight charges. *See also Southern Pacific*, 454 F.2d at 362. *Penn Central* involved the effect of a prior non-judicial set-off on subsequent reorganization proceedings, issues directly implicating the non-favoritism policy articulated above in *Lindell*. In the present case, unlike *Penn Central*, construing a damage claim as a defense rather than as a separate action for purposes of tolling the limitations period would seemingly have little effect on preventing illegal, disguised discounts. Conrail offers no explanation of how tolling would promote this fraud.

This defense/separate action distinction is further minimized by the Supreme Court's pronouncement in *Reiter v. Cooper*, —— U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). In a suit for freight charges, the Court allowed a defendant to bring a counterclaim challenging the reasonableness of the rate even though the statute of limitations had run. Noting Rule 8(c), which allows a court to construe a mistakenly pleaded defense as a counterclaim and vice versa, the court held that under any label the "counterclaim" sounded in recoupment and could be asserted so long as the main action was timely. *Id.* at ——, 113 S.Ct. at 1218. Although brought under a section other than the Carmack Amendment, since the non-discrimination

---

9. Although no court has specifically addressed the tolling issue, several have dismissed counterclaims for damages for failure to comply with the nine-month filing requirement. *Atchison, Topeka & Santa Fe Ry. Co. v. Littleton Leasing & Invest-* ment Co., 582 F.2d 1237 (10th Cir.1978); *East Texas Motor Freight Lines v. United States*, 239 F.2d 417 (5th Cir.1956); *United Van Lines, Inc. v. Shooster*, 860 F.Supp. 826 (S.D.Fla.1992).

policy relied on in *Penn Central* would equally apply to the reasonable rate attack in *Reiter*, the distinction made in *Penn Central* seems inapplicable to the present tolling issue.

■ In *Reiter*, the Court defined recoupment as "the setting off against asserted liability of a counterclaim arising out of the same transaction." *Id.* Therefore, whether labeled as a defense or a counterclaim embodying a separate cause of action, a claim for damages under the Carmack Amendment is a claim for recoupment. As such, following the *Reiter* Court's holding, bringing a counterclaim under the Carmack Amendment is likewise "not barred by a statute of limitations so long as the main action is timely." *Id.; see also Bull v. United States*, 295 U.S. 247, 262, 55 S.Ct. 695, 700, 79 L.Ed. 1421 (1935); 3 James Moore et al., Moore's Federal Practice ¶ 13.11 (1992). Moreover, under the Supreme Court's analysis, the statute of limitations on a claim for recoupment is not only tolled, it is waived by the institution of the main action.

■ That does not end the inquiry, however, because strictly speaking neither 49 U.S.C. § 11707(e) nor § 2(b) of the Uniform Straight Bill of Lading is a statute of limitations. *Westhemeco Ltd. v. New Hampshire Ins. Co.*, 484 F.Supp. 1158, 1161 (S.D.N.Y. 1980). Technically, a statute of limitations does not extinguish a right of action but "bars the remedy sought to be enforced and terminates the right of access to the courts for enforcement of the existing right." *KSLA–TV, Inc. v. Radio Corp. of America*, 732 F.2d 441, 443 (5th Cir.1984). It is a legislative limit on a party's ability to bring an action. *United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979). For example, *Reiter* centered on the effect of 49 U.S.C. § 11705(c)(2) which states: "A person must bring a civil action to recover damages [for overcharging] within 2 years after the claim accrues."

Unlike *Reiter* and § 11705(c)(2), neither § 11707(e) nor § 2(b) limit filing suit to a specific time period. The Carmack Amendment states in relevant part: "A carrier ... may not provide by rule, contract, or otherwise, a period of less than 9 months for filing a claim. ..." This provision does not render a claim unenforceable in court, but merely sets reasonable limits on restricting the time for filing a claim with a carrier. Similarly, § 2(b) doesn't foreclose a shipper's right to bring suit either. That provision reads, "As a *condition precedent* to recovery, claims must be filed ... within nine months after delivery of the property. ... Where the claims are not filed ... in accordance with [the nine-month requirement], no carrier hereunder shall be liable, and such claims will not be paid." (emphasis added). Unlike a statute of limitations which bars enforcement of a cause of action, this language operates as "condition precedent" to maintaining a suit. In absolving liability rather than restricting its enforcement, the notice requirement prevents accrual of a cause of action absent compliance with its mandates. Therefore, whether or not a carrier brings a suit for freight charges, if a shipper fails to give proper notice of a claim for damages within the proscribed time limits, the shipper has no cause of action to bring.

■ While this distinction may seem formalistic, reading the contractual language otherwise effectively renders it meaningless and undermines the purpose of the notification requirement. The nine-month filing period is designed to provide a carrier with notice of and an opportunity to promptly and thoroughly investigate a claim for damages. *Pathway*, 630 F.2d at 903 n. 5. If the nine-month period is a "statute of limitations," and consequently is waived or tolled by a carrier's suit for freight charges, to preserve its damage claim a shipper could merely withhold some or all payment due under a bill of lading.[10] Then, when and if the carrier filed suit, the shipper would be free to assert its counterclaim under the Carmack Amendment long after the nine-month notifi-

---

10. Presumably, a shipper would only resort to this tactic when its claim for damages was less than the freight charges that it owed to the

carrier, as in this case. This does not diminish the potential for abuse, however.

cation period had passed. This eventuality would not only read the nine-month requirement out of the bill of lading, but would undermine its purpose of providing prompt notice to the carrier to facilitate investigation.

Moreover, the parties agreed that the terms of the Uniform Straight Bill of Lading, which provides that Primary Coal had nine months to file a claim for damages, governed the shipments. Neither the four contracts at issue, the Uniform Straight Bill of Lading, nor the ICC regulations indicate that the notification period under the Carmack Amendment is tolled upon filing a suit for freight charges. While it may seem that Conrail receives a "windfall" from Primary Coal's delay, the blame is "properly traced, not to the existence of the regulations, but to shipper's unexcused failure to comply with a reasonable condition contained in bills of lading." *Pathway*, 630 F.2d at 903, n. 5. Therefore, because § 2(b) is not a "statute of limitations" but a prerequisite to establishing a claim, and because the parties' agreements are silent on the issue of tolling, we hold that the claim filing period provided for in 49 U.S.C. § 11707 is not tolled or waived upon the filing of an action for freight charges.

### 2. Notice

Based on a series of letters it sent to Conrail during September and October 1991, Primary Coal next argues that Conrail had notice of its claims for damages within the nine-month period. Since the parties have specifically incorporated 49 C.F.R. § 1005 into their shipping agreements, the Court must determine whether these letters satisfy the regulatory notice requirements. *See also Pathway*, 630 F.2d at 904. That section requires that a notice be in writing and 1) contain sufficient facts to identify the shipment, 2) assert liability for damages against the carrier, and 3) make a claim for a

specified and determinable amount of money. 49 C.F.R. § 1005.2(b). In applying these requirements, courts should liberally construe the nature of the writing required to determine whether a claim has been made. *Georgia, Florida & Alabama Ry. v. Blish Milling Co.*, 241 U.S. 190, 198, 36 S.Ct. 541, 545, 60 L.Ed. 948 (1916); *Westhemeco*, 484 F.Supp. at 1162. Even under this relaxed standard, however, although arguably the letters assert liability and identify the shipments, they cannot constitute a claim as required under the Uniform Straight Bill of Lading since none of them specify a determinable amount of damages.

On September 5, 6, 12, and 19 of 1991, Primary Coal sent letters by telefax to Conrail protesting delays that prevented the loading of various vessels at the Consol Terminal in Baltimore.[11] In addition, in the September 6th letter, Primary Coal indicated its intent to hold Conrail "fully responsible" for dead freight charges on vessels due to Conrail's failure to provide equipment at mines for two specific trainloads. In each of these letters Primary Coal indicated its intent to "hold Conrail fully responsible for any such damages should they be incurred."

On October 1, Primary Coal sent a letter to Conrail outlining a list of vessels to which coal shipments had been late, indicating the delay associated with each vessel, and requesting the reasons for the delay to substantiate its claims of force majeure against the vessel owners, who were asserting demurrage and damages costs. As a supplement to this letter, on October 9 Primary Coal provided a list of the dates that each trainload was scheduled to be dumped at the terminal, when it was actually dumped, and the resulting delay for each vessel. Apparently in response, Conrail issued a series of form letters denying liability for each of the alleged delays.[12]

---

11. Specifically, in the September 5th letter, Primary Coal indicated it would "have no choice but to hold [Conrail] and Consol Terminal responsible for any damages [it] incur[red] as a result of these delays." In the September 6th letter, Primary Coal "protested vehemently" and "urged [Conrail] to resolve the matter imminently." Likewise, in the September 19th letter, Primary Coal informed Conrail that it "[hereinafter]

put Conrail on notice that [if vessel owners asserted damage claims, it would] hold Conrail fully responsible for any such damages should they be incurred."

12. For an example of one such letter, see *supra* note 4.

Although Primary Coal's letters did identify the affected shipments and clearly asserted Conrail's liability for any damage, none of them asserted a specified or determinable amount of damages. Taking all inferences in Primary Coal's favor, while it is clear that Conrail was aware of the potential liability Primary Coal faced, and arguably that it might also face, this notice does not constitute a claim for damages. Courts have consistently held that notice of damage is not a claim for damages under the Uniform Straight Bill of Lading. *R.T.A. Corp.*, 594 F.Supp. at 209–10 (S.D.N.Y.1984) (citing *Pathway*).

Primary Coal counters that even if its letters failed to specify a dollar amount, they satisfied the spirit of the notice requirement. Although some Circuits have apparently relaxed the determinable damage requirement, *see, e.g., Insurance Co. of N. America v. G.I. Trucking Co.*, 1 F.3d 903, 907 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 690, 126 L.Ed.2d 658 (1994); *Wisconsin Packing Co. v. Indiana Refrigerator Lines, Inc.*, 618 F.2d 441, 446–48 (7th Cir.), *cert. denied,* 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980), this Circuit has not. *Pathway*, 630 F.2d at 904. As such, in *Bobst Division of Bobst Champlain, Inc. v. IML–Freight, Inc.*, 566 F.Supp. 665 (S.D.N.Y.1983), this Court found a claim insufficient on facts more favorable to the shipper than here. In that case, Judge Haight held that a notice that estimated the amount of damage as approximately $100,-000.00 was insufficient under the ICC regulations. As the court stated:

> ... a claim for an "uncertain amount" cannot be regarded as constituting compliance with the minimum filing requirements....

*Id.* at 669. Given that none of the notices to Conrail projected, estimated, or remotely attempted to calculate a damage amount, they cannot be considered claims for damages. Moreover, the author of all but the October 1 letter indicated that to the best of his knowledge, Primary Coal never filed a claim for damages with Conrail. Kuepper Aff. ¶ 7. Accordingly, we hold that the letters submitted to Conrail did not constitute claims for damages within the meaning of the Uniform Straight Bill of Lading and 49 C.F.R. § 1005.2.

### 3. The Pathway Footnote

Apparently relying on the concluding footnote in *Pathway*, Primary Coal argues that because it was unable to determine its damages within the nine-month period and/or because Conrail's form denials of liability misled it to believe no further notice was required, the nine-month period should be waived. That footnote provides:

> Had any conduct on the part of Penn Central misled Pathway Bellows into believing that there was no need to file a claim, or that the letter of May 12, 1975 was sufficient to constitute a claim, Penn Central might be held estopped from insisting on Pathway Bellows's compliance with the timely written claim requirement contained in the bill of lading. *See, e.g., Perini–North River Associates v. Chesapeake & O. Ry.*, 562 F.2d 269, 272–73 (3d Cir.1977). Similarly, if Pathway Bellows could not, in the exercise of reasonable diligence, have ascertained the extent of its loss within the 9 month claim filing period, untimely filing of a completed claim might be viewed as excusable. *See Ex Parte No. 263, supra,* 340 I.C.C. at 554–55.

*Pathway*, 630 F.2d at 905 n. 10.

■ First, Primary Coal asserts that Conrail's response letters denying liability led it to believe that filing a more formal claim was unnecessary. Therefore, Conrail should be estopped from invoking the nine-month filing limitation. This precise basis of estoppel has previously been rejected by the First Circuit and this Court. In *Nedlloyd Lines, B.V. Corp. v. Harris Transport Co.*, 922 F.2d 905 (1st Cir.1991), Nedlloyd sent a letter to the defendant indicating its intent to hold the defendant carrier liable for damages associated with a shipment. The letter did not contain a specified and ascertainable amount of money as damages. In response, Harris sent a letter denying responsibility. Nedlloyd then sent a second letter reasserting liability. After finding that neither of Nedlloyd's letters satisfied the ICC regulatory requirement of specifying damages, the Court ruled that Nedlloyd could not claim

estoppel based on the denials. Citing *R.T.A. Corp. v. Consolidated Rail Corp.*, 594 F.Supp. 205 (S.D.N.Y.1984), the court held that "the representation of the defendant, rejecting plaintiff's claim, had no bearing on plaintiff's legal obligations." *Nedlloyd*, 922 F.2d at 909. Similarly, in *Bobst*, Judge Haight held that silence alone was insufficient to justify imposing estoppel. Noting that "[e]stoppel, within the context of the mandatory, statutory, and regulatory scheme, should not be lightly found," he distinguished *Perini*, the case relied on in *Pathway*, which found estoppel based on affirmative misrepresentations that no written claim need be filed. *Bobst*, 566 F.Supp. at 669–70.

This case is indistinguishable from *Nedlloyd* and *R.T.A.;* nor, like *Bobst*, does Primary Coal allege that Conrail made any affirmative misrepresentation that filing a claim was unnecessary. Moreover, none of Conrail's actions in denying liability were in any way inconsistent with a later assertion that the claims were not timely. *Capon Textile Trading Co. v. Consolidated Rail Corp.*, 538 F.Supp. 1083, 1085 (S.D.N.Y.1982). Primary Coal's plea for estoppel must fail.

 Finally, Primary Coal asserts that its damages were undeterminable during the nine-month period, and as such the filing requirement should be waived. As the ICC report on which the *Pathway* court based its footnote indicates, the nine-month period might be waived "when it is impossible for a claimant to determine accurately the amount that should be claimed." *Ex parte No. 263: Rules, Regulations, and Practices of Regulated Carriers With Respect to the Processing of Loss and Damage Claims*, 340 I.C.C. 515, 555 (1972). To invoke this protection, however, Primary Coal must show it exercised "reasonable diligence" to determine the amount of damage. *Bobst*, 566 F.Supp. at 671.

 Primary Coal asserts it paid out substantial sums of money to vessel owners and customers to settle claims as a result of Conrail's delay. To this day, however, Primary Coal has never established the extent of these payments. While these damages may indeed be undetermined, Primary Coal has neither provided evidence of its reasonable diligence nor demonstrated why these damages were impossible to assess during the nine-month period. As this Court has previously held:

> [F]iling is excused only if circumstances rendered a filing within nine months "impossible"; so that a claimant who has it within its power to ascertain the amount of the loss and make it available to the carrier within nine months must do so.

*Bobst*, 566 F.Supp. at 672. Congress has determined that the nine-month period is a reasonable limitation, and the parties contracted for that period. Absent compelling reasons not alleged here, we are reluctant to alter the parties' agreements. Since the communications from Primary Coal to Conrail did not constitute notice of a claim or claims and no other sufficient notices were given within the nine-month notification period, Primary Coal's counterclaim under the Carmack Amendment must also be dismissed.

## IV.

 On its motion for summary judgment on its claims, Conrail argues that since Primary Coal does not dispute that freight charges are due or the extent of those charges, the Court should issue summary judgment. In addition, under the same rationale, Conrail apparently is seeking summary judgment on its claim against Primary Industries. Indeed, Primary Coal's sole argument in opposition to Conrail's motion is that its counterclaim creates issues of material fact that prevent granting summary judgment on Conrail's claims. Having dismissed Primary Coal's counterclaims, its argument obviously becomes moot. Since neither party disputes that the freight charges remain unpaid, nor the extent of those charges,[13] the Court will grant summary judgment as to Conrail's claim for these charges against Primary Coal.

---

13. Conrail is asking for $5,136,082.87, Primary Coal's books actually indicate it owes Conrail $5,141,535.81. We find this discrepancy insufficient to create an issue of material fact. As to the amount pleaded by Conrail, there is no dispute that it is due and owing.

Regarding Conrail's claim against Primary Industries, apparently Conrail is relying on a letter from Primary Industries in March 1978 indicating it would guarantee credit extended by Conrail to Primary Coal up to $1,000,000. Primary Industries argues that because this letter is a guaranty, Primary Industries is liable only if a judgment is rendered against Primary Coal.

Seemingly, since we have granted Conrail's summary judgment motion for freight charges, even given Primary Industries' characterization of the letter, it would now be liable based on its guaranty. However, in its statement pursuant to local rule 3(G) and its memorandum in support of its motion, Conrail does not mention this letter or on what theory it asserts liability against Primary Industries. Moreover, in its *Notice of Motion Pursuant to Rule 56 F.R.C.P.*, Conrail indicates it is moving for summary judgment on its "complaint". Conrail only includes its complaint against Primary Coal in its accompanying exhibits. *See Plaintiff's Exhibits* 1. In fact, Conrail's first mention that it is also moving against Primary Industries occurred in its reply to defendants' answer to its motion.

As indicated above, on a summary judgment motion, the moving party has the burden of establishing that there are no issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Conrail's only reference to its claim against Primary Industries is in its reply to defendants' motion in opposition. *Plaintiff's Reply* at 1. It is not for the Court "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. It is the responsibility of the party seeking summary judgment to inform the Court of the basis for its motion, and identify the portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. Conrail neither supplied a basis for supporting its motion against Primary Industries nor referred to any items of record that support such a ruling. On the scant record before us, we are not in a position to grant summary judgment on Conrail's motion against Primary Industries.

For the reasons stated above, Conrail's motion for summary judgment dismissing Primary Coal's counterclaims is granted, Conrail's motion for summary judgment on its claim against Primary Coal is granted, Conrail's motion for summary judgment on its claim against Primary Industries is denied, and Primary Coal's crossmotion for summary judgment on its counterclaims is denied.

**SO ORDERED.**